Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 19, 2017

**2017 CO 73**

**Nos. 15SA118 and 15SA277, <u>Gallegos Family Properties, LLC v. Colorado Groundwater Commission</u>—Water Law—Designated Groundwater Basins—Costs.**

The supreme court concludes that the designated groundwater court properly concluded that petitioners failed to satisfy their statutory burden in seeking to de-designate a portion of a designated groundwater basin, and therefore, properly denied the petition to de-designate a portion of the basin.  The supreme court also concludes that the designated groundwater court properly awarded the respondents a portion of their litigation costs as prevailing parties under C.R.C.P. 54(d).  The supreme court affirms the designated groundwater court in both cases.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

## 2017 CO 73

---

## Supreme Court Case No. 15SA118
*Appeal from the District Court*
Weld County District Court, Water Division 1, Case No. 03CV1335
Honorable James F. Hartmann, Designated Groundwater Judge

---

### Plaintiffs-Appellants:

Gallegos Family Properties, LLC; Marianne Gallegos; Ellen Gallegos; Gene J. Gallegos; and Reinaldo Gallegos,

v.

### Defendants-Appellees:

Colorado Groundwater Commission, an administrative agency of the State of Colorado; Dick Wolfe, in his capacity as the Colorado State Engineer, and as *ex officio* Executive Director of the Colorado Ground Water Commission, and as a non-voting member of the Colorado Ground Water Commission; Joseph B. Grantham, in his capacity as a Hearing Officer for the Colorado Ground Water Commission; Edna B. Anderson; William Anderson; BCK Heath Property LLC; Larry L. Croissant; Jean L. Croissant; Deerco LLC; Kenneth Everitt; Penny Everitt; Four Diamonds Ranch LLC; Hereford Farms, LLC; Rosella J. Jessen; Anita R. Johnson; Rod Johnson; Carl A. Johnson; James L. Karst; Judy Karst; James M. Konig; Janet F. Konig; Michael D. Konig; Konig Investments LLC; Larry Lang; Dan Loyd; Loyd Farms; Loyd Farms General Partnership; Jesse E. Loyd; Evelyn T. Loyd; F & R Marick; Fred D. Marick; Roxanne L. Marick; Philip McKinley; Diane McKinley; Colin W. Nicklas; Charles E. Nussbaum; Dorothy Nussbaum; C & D Nussbaum; Richard L. Pettinger; Lisa R. Pettinger; Rory J. Pettinger; Rocky Plains LLP; TR, Inc.; Lee A. Tappy; Tennick Land & Cattle Co.; Clarence W. Tietmeyer; Vonda J. Tietmeyer; Clarence E. Tietmeyer; Scott W. Tietmeyer; Paula J. Tietmeyer; Vonda Jean Tietmeyer; Darrell J. Timm; Donald L. Timm; Town of Grover; and Sharon C. Young.

---

### Judgment Affirmed
*en banc*
[June 19, 2017]

---

* * * * *

**Plaintiff-Appellant:**

Gallegos Family Properties, LLC,

v.

**Defendants-Appellees:**

William Anderson, Larry Lang, Dan Loyd, Loyd Farms, Loyd Farms General Partnership, Jesse E. Loyd, Evelyn T. Loyd, Richard L. Pettinger, Lisa R. Pettinger, Rory J. Pettinger, Clarence W. Tietmeyer, Vonda J. Tietmeyer, Clarence E. Tietmeyer, Scott W. Tietmeyer, Paula J. Tietmeyer, and Vonda Jean Tietmeyer.

**Judgment Affirmed**
*en banc*
[June 19, 2017]

**Attorneys for Plaintiffs-Appellants:**
Buchanan Sperling & Holleman, PC
Timothy R. Buchanan
John D. Buchanan
 *Arvada, Colorado*

**Attorneys for Defendants-Appellees Colorado Groundwater Commission, an administrative agency of the State of Colorado; Dick Wolfe, in his capacity as the Colorado State Engineer, and as *ex officio* Executive Director of the Colorado Ground Water Commission, and as a non-voting member of the Colorado Ground Water Commission; and Joseph B. Grantham, in his capacity as a Hearing Officer for the Colorado Ground Water Commission:**
Natural Resources & Environment Section
Office of the Colorado Attorney General
Cynthia H. Coffman, Attorney General
Patrick E. Kowaleski, Senior Assistant Attorney General
 *Denver, Colorado*

**Attorneys for Defendants-Appellees William Anderson, Larry Lang, Dan Loyd, Loyd Farms, Loyd Farms General Partnership, Jesse E. Loyd, Evelyn T. Loyd, Richard L. Pettinger, Lisa R. Pettinger, Rory J. Pettinger, Clarence W. Tietmeyer, Vonda J. Tietmeyer, Clarence E. Tietmeyer, Scott W. Tietmeyer, Paula J. Tietmeyer, and Vonda Jean Tietmeyer:**
Lawrence Jones Custer Grasmick LLP
David P. Jones

Wesley S. Knoll
*Johnstown, Colorado*

No appearance by or on behalf of: Edna B. Anderson; BCK Heath Property LLC; Larry L. Croissant; Jean L. Croissant; Deerco LLC; Kenneth Everitt; Penny Everitt; Four Diamonds Ranch LLC; Hereford Farms, LLC; Rosella J. Jessen; Anita R. Johnson; Rod Johnson; Carl A. Johnson; James L. Karst; Judy Karst; James M. Konig; Janet F. Konig; Michael D. Konig; Konig Investments LLC; F & R Marick; Fred D. Marick; Roxanne L. Marick; Philip McKinley; Diane McKinley; Colin W. Nicklas; Charles E. Nussbaum; Dorothy J. Nussbaum; C & D Nussbaum; Rocky Plains LLP; TR, Inc.; Lee A. Tappy; Tennick Land & Cattle Co.; Darrell J. Timm; Donald L. Timm; Town of Grover; and Sharon C. Young.

**JUSTICE BOATRIGHT** delivered the Opinion of the Court.

3

¶1     Gallegos Family Properties, LLC ("Gallegos"), returns to this court for a second time in its effort to de-designate a portion of the Upper Crow Creek Designated Ground Water Basin ("the Basin") and redraw the Basin boundaries to exclude twenty-five wells so that the State Engineer can curtail these junior groundwater rights in favor of Gallegos's senior surface water rights on Crow Creek. The defendants–appellees ("Well Owners") oppose this petition because if their properties remain within the Basin, the State Engineer cannot curtail their junior groundwater rights.

¶2     This opinion addresses appeals from two related cases: Gallegos's petition to de-designate a portion of the Basin, Case No. 15SA118, and an order awarding the Well Owners a portion of their litigation costs, Case No. 15SA277. We must decide whether Gallegos satisfied the statutory standard for de-designating a portion of the Basin set forth in section 37-90-106(1)(a), C.R.S. (2003),[1] and as interpreted by this court in

---

[1] The General Assembly amended section 37-90-106 in 2010. The amended statute preserves the Commission's ability to alter designated groundwater basin boundaries, but only on the condition that "factual data justify the alteration and the alteration would not exclude from the designated groundwater basin any well for which a conditional or final permit to use designated groundwater has been issued." § 37-90-106(1)(a). The amended statute also explicitly conveys the General Assembly's intent that "there be a cut-off date beyond which the legal status of groundwater included in a designated groundwater basin cannot be challenged, and that such cut-off date was intended to be the date of finality for the original designation of the basin." Id. The amended statute also provides that the amendment shall not affect litigation pending as of January 1, 2010, meaning it does not affect this litigation. Id. § -106(1)(a.5).

Gallegos v. Colorado Ground Water Commission, 147 P.3d 20 (Colo. 2006),[2] and whether Gallegos should bear the Well Owners' costs.[3] Specifically, we must determine whether Gallegos successfully showed by new evidence not before the Designated

---

[2] As to the Basin de-designation matter, Case No. 15SA118, Gallegos raises the following two issues:

1. Whether the district court erred by applying standards other than those directed by the General Assembly and this court in Gallegos v. Ground Water Commission, 147 P.3d 20 (Colo. 2006), when the district court refused to modify the boundaries of the Upper Crow Creek Designated Ground Water Basin ("Basin") to prevent withdrawals of tributary ground water that injure the Gallegos Family's senior surface water rights.

2. Whether the district court erred by determining that the Gallegos Family's petition to de-designate a portion of the Basin was precluded based on evidence that was not before the Commission when the Basin was designated, which directly contradicts the standard set forth by the supreme court in Gallegos.

[3] As to the matter of costs awarded to the Well Owners, Case No. 15SA277, Gallegos raises the following five issues:

1. Whether the costs incurred by Defendants in supporting the Ground Water Commission's opposition to the Gallegos Family, LLC's petition were necessary and may be awarded under C.R.C.P. 54(d).

2. Whether the trial court erred as a matter of law by awarding expert witness fees to Defendants in excess of the number of hours that the court found reasonable.

3. Whether the trial court abused its discretion by awarding costs related to a discovery deposition when Defendants provided the court with no information regarding their need for or use of the deposition.

4. Whether the trial court erred as a matter of law by awarding to Defendants the costs incurred by the Gallegos Family, LLC's expert witness in responding to Defendants' discovery requests, which costs must be paid by Defendants pursuant to C.R.C.P. 26(b)(4)(C).

5. Whether an entity that was not a party to the proceedings may recover costs under C.R.C.P. 54(d).

5

Groundwater Commission in 1987 ("1987 Commission") that "future conditions require and factual data justify" de-designation because well pumping in the Basin has greater than a de minimis impact on Gallegos's surface rights. The designated groundwater court concluded that Gallegos had failed to make new showings sufficient to justify de-designating a portion of the Basin and taxed Gallegos for a portion of the Well Owners' costs. We affirm.

¶3 We conclude that Gallegos failed to prove by evidence not before the 1987 Commission that the Well Owners are pumping water connected to Crow Creek such that future conditions and factual data justify de-designating a portion of the Basin. Because a party must show connectivity to prove impact, Gallegos failed to meet its burden, and de-designation is improper. Accordingly, we affirm the designated groundwater court's order denying Gallegos's petition. Furthermore, because the designated groundwater court properly denied Gallegos's petition for de-designation, we conclude that the court did not abuse its discretion in concluding that the Well Owners were prevailing parties for purposes of C.R.C.P. 54(d), that the costs awarded were reasonable and necessary, and that Gallegos should pay these costs pursuant to Rule 54(d).

## I. Facts and Procedural History

¶4 Gallegos's surface water rights consist of a combined flow of 413 cubic feet per second in the Consolidated Larson Ditch and storage of 59.5 acre-feet in Larson Reservoir #1. These rights were decreed in 1914 to irrigate up to 1,920 acres of land in Weld County. This consolidated decree, known as the Larson rights, is senior to the

6

Well Owners' groundwater rights in the Basin, most of which date back to the 1940s and '50s. The Larson rights divert from a headgate on Crow Creek, a tributary of the South Platte River that originates in Wyoming and flows into Colorado. Before 1950, Crow Creek had a reliable base surface flow in Colorado, but as surface use and pumping increased in Wyoming, water users in Colorado turned from increasingly unreliable surface rights to pumping from the aquifers underlying Crow Creek.

¶5     In 1983, a group that included the Well Owners (or their predecessors in interest) and Gallegos's predecessor in interest petitioned the Colorado Groundwater Commission to designate the Basin. Gallegos's predecessor was one of the main supporters of the designation effort because he, like the Well Owners, could no longer rely on his surface rights to meet his needs. Following a state-funded viability study, the results of which are detailed in a document that the parties call the Kirkham Report, the Commission's hearing officer held the initial designation hearing in 1986. After amending the proposed Basin boundaries to accommodate the sole objection to designation, the hearing officer designated the Basin pursuant to one of the two designation standards in section 37-90-103(6)(a), C.R.S. (2016).[4] Under the second standard (the standard under which the 1987 Commission designated the Basin), designation is proper for "groundwater in areas not adjacent to a continuously flowing natural stream wherein groundwater withdrawals have constituted the principal water

---

[4] The definitions of designated groundwater in section 37-90-103(6)(a), which serve as the two designation standards, have not been changed or amended since the 1987 Commission designated the Basin.

usage for at least fifteen years preceding the date of the first hearing on the proposed designation of the basin." § 37-90-103(6)(a). The 1987 Commission affirmed the hearing officer's findings and decision to designate the Basin under this designation standard. No party appealed.

¶6      In 1999, Gallegos purchased the Larson rights and most of the associated farmland. Gallegos leased out the land and water rights until 2002, when the tenant farmer's alfalfa crop failed because insufficient surface flows precluded irrigation. Gallegos petitioned the State Engineer to curtail the Well Owners' pumping, claiming that the Well Owners' pumping had injured Gallegos's senior surface rights. When the State Engineer denied the request for lack of jurisdiction over designated groundwater basins, Gallegos appealed to the Commission. The hearing officer, and later the Commission, concluded that claim and issue preclusion barred Gallegos from seeking curtailment of the Well Owners' wells because (1) Gallegos's predecessor had notice of the designation proceeding, and (2) Gallegos's predecessor had actually sought the designation. The Commission also concluded that it lacked jurisdiction over surface waters and could not, therefore, curtail pumping in a designated groundwater basin to protect such waters. On appeal, the designated groundwater court disagreed, concluding that Gallegos was not barred by claim or issue preclusion and that the Commission had erred in concluding that it lacked jurisdiction. Although this result validated Gallegos's ability to seek de-designation from the Commission, it did not mandate that the Commission de-designate the Basin as Gallegos had hoped.

¶7 Gallegos appealed to this court. Gallegos v. Colo. Ground Water Comm'n (Gallegos I), 147 P.3d 20 (Colo. 2006). To resolve that appeal, we clarified two salient points of distinction between tributary groundwater managed under the Water Rights Determination and Administration Act, sections 37-92-101 to -602, C.R.S. (2016) ("1969 Act"), and designated groundwater managed under the Colorado Groundwater Management Act, sections 37-90-101 to -143, C.R.S. (2016) ("Management Act"). We first distinguished tributary groundwater from designated groundwater, explaining that "designated groundwater cannot, as a matter of law, impact surface flows by greater than a de minimis amount." Gallegos I, 147 P.3d at 28. Second, we affirmed that the Commission has jurisdiction to determine whether groundwater is tributary to surface water or designated groundwater, id. at 29–30, and that it retains jurisdiction over groundwater that it concludes is designated groundwater, id. at 31–32. Only if the Commission has determined that the disputed water is not designated groundwater does it lose jurisdiction. Id.

¶8 Having confirmed that the Commission had jurisdiction over Gallegos's claim, we also concluded, however, that claim and issue preclusion limited the evidence that Gallegos could offer to only that evidence that was not before the 1987 Commission. Id. at 33. We remanded the case to the hearing officer to afford Gallegos its opportunity to show by such evidence that the Well Owners' pumping has greater than a de minimis impact on—i.e., is connected to and injures—Gallegos's senior surface rights, and that future conditions and factual data justified de-designating a portion of the Basin.

¶9 On remand to the hearing officer, Gallegos retained several experts to substantiate and testify to its claim that the Well Owners' pumping impacted its senior surface rights. As to connectivity, Gallegos asserted that the 1987 Commission had not seen or considered evidence that Crow Creek was a gaining stream at the Larson headgate, and by implication, that the alluvial aquifer thinned to a neck at the Larson headgate, causing groundwater to come to the surface and become available for diversion. Gallegos's expert drilled test wells and observed stream flows in the immediate vicinity of the alluvial neck to substantiate this point. As to injury, Gallegos argued that the 1987 Commission had inadequate evidence of, and thus underestimated, the extent of depletion that pumping in Wyoming and Colorado would have on surface water availability in Crow Creek. The Well Owners disputed Gallegos's methodology and asserted that Gallegos had failed to meet its burden under section 37-90-106(1)(a) and Gallegos I.

¶10 The hearing officer ultimately concluded that Gallegos had not met its burden of producing new evidence not before the 1987 Commission. As to connectivity, the hearing officer concluded that Plate 2 in the Kirkham Report, an image of a potentiometric[5] map of the Basin designation area, clearly shows the necking of the alluvial aquifer, and because the Kirkham Report was one of the primary pieces of

---

[5] A "potentiometric surface"—also known as a "piezometric surface"—is "an imaginary surface representing the level to which groundwater will rise as a result of the pressure under which it is confined in an aquifer." 5 Waters and Water Rights Glossary (Amy K. Kelley, ed., 3d ed. LexisNexis/Matthew Bender 2017). A potentiometric surface is analogous to a water table, though they are technically different. Id. § 18.03(a.01).

evidence that the 1987 Commission relied on, this evidence was not new. As to injury, the hearing officer concluded that the lack of streamflow measurements on Crow Creek impeded Gallegos's showing of injury because there was no way to quantify stream depletion and the effect, if any, that curtailment would have on streamflow. The hearing officer also found, contrary to Gallegos's argument, that the 1987 Commission had received evidence of and anticipated increased pumping in Wyoming. More significantly, the hearing officer found that pumping in Colorado had actually decreased since the Basin was designated. Having concluded that Gallegos had failed to meet its burdens under section 37-90-106(1)(a) and Gallegos I, the hearing officer recommended denial of the petition in March 2012. The full Commission affirmed this recommendation on appeal.

¶11 Gallegos appealed to the designated groundwater court in de novo proceedings. On Gallegos's motion, the court issued three pretrial orders limiting the scope and focus of the litigation, the most significant for our purposes being one that found that evidence "before the [1987] Commission" included evidence actually presented during the designation proceedings and evidence available but not actually presented so long as the parties had notice of it. At trial, Gallegos refined its connectivity argument about the necking of the alluvium, arguing that the 1987 Commission had not known that water discharged to the surface at the neck when the aquifer was sufficiently saturated. As to injury, Gallegos's expert testified about monitoring the recharge rate and water table measurements in eight test wells, and extrapolated an injury quantity from similar

11

measurements taken during the designation viability study. Gallegos also reiterated the arguments that it had raised about connectivity and injury to the hearing officer.

¶12    The designated groundwater court affirmed the decision not to de-designate a portion of the Basin. The court acknowledged the consensus among the parties that the groundwater in the Basin was connected to the surface water that feeds the Larson rights. However, it also noted that the 1987 Commission had considered Plate 2 of the Kirkham Report and other evidence of this connection, and that Gallegos had not, therefore, offered evidence that was not before the 1987 Commission. Consequently, the designated groundwater court rejected Gallegos's argument that the connectivity was a future condition pursuant to section 37-90-106. Under the injury prong, the court agreed with the hearing officer that the 1987 Commission had received evidence of increasing water use in Wyoming and that its designation decision anticipated that this trend would continue. It also found that pumping in the Basin had actually decreased since 1987 when the Basin was designated, and that Colorado pumping activity therefore could not have created a new injury arising as a future condition pursuant to section 37-90-106. Finally, the court found the Well Owners' primary expert to be more credible than Gallegos's primary expert, and it credited the former's testimony that the latter's injury estimates were incorrect and based on flawed modeling. The court thus concluded that Gallegos had failed to meet its burden in proving injury. The designated groundwater court ultimately concluded that Gallegos had failed to satisfy both its statutory burden and the standard we set out in Gallegos I, meaning de-designation of part of the Basin to exclude the Well Owners' wells was improper.

12

¶13 Having resolved the merits of the dispute, the designated groundwater court awarded $44,746.92 in costs to the Well Owners. The court initially found that although the Well Owners were not the named defendants when Gallegos first filed its petition, they were nevertheless "parties" for purposes of awarding costs under C.R.C.P. 54(d). Because the Well Owners joined the litigation as indispensable parties to defend their interests in maintaining the Basin boundaries and they obtained this result, the court concluded that they had prevailed. Having established the Well Owners' general eligibility to move for and obtain a costs award, the court analyzed each claimed category of costs. The bulk of the costs related to expert witnesses. The court awarded those costs as being reasonable and necessary, particularly in light of the court's finding that the Well Owners' primary expert was "integral" to their challenge against Gallegos's petition. The court also exercised its discretion to award the other costs—mileage expenses, hotels, transcript preparation fees, and copying fees—as having been reasonable and necessary to resist Gallegos's attempt to de-designate a portion of the Basin.

¶14 Gallegos now appeals the order denying de-designation of a portion of the Basin to exclude the Well Owners' wells and the order awarding the Well Owners a portion of their costs.

## II. Analysis

¶15 Although the designated groundwater court addressed both the connectivity and injury prongs in its order on de-designation, we find it unnecessary to do so. Because Gallegos must prove both connectivity and injury under the impact showing, failure to

prove either is fatal to Gallegos's claim. We conclude that Gallegos failed to prove by evidence not before the 1987 Commission that the Well Owners are pumping water connected to Crow Creek such that future conditions and factual data justify de-designating a portion of the Basin. Because connectivity is an essential element of the impact showing, Gallegos failed to meet its burden, and de-designation is improper. We also conclude that the designated groundwater court did not abuse its discretion in concluding that the Well Owners were prevailing parties for purposes of C.R.C.P. 54(d), that the costs awarded were reasonable and necessary, and that Gallegos should pay these costs pursuant to Rule 54(d).

¶16 We begin by discussing the applicable law governing de-designation of a designated groundwater basin under section 37-90-106(1)(a). We then address connectivity and why Gallegos failed to meet its burden under the designation statute and Gallegos I. Finally, we address Gallegos's appeal of the designated groundwater court's order awarding the Well Owners a portion of their costs.

### A. De-Designation of the Basin—Case No. 15SA118

### 1. Standard of Review

¶17 This case presents questions of both law, which we review de novo, and fact, which we review for clear error. See Meridian Serv. Metro. Dist. v. Ground Water Comm'n, 2015 CO 64, ¶ 12, 361 P.3d 392, 395. We will only disturb the designated groundwater court's findings of fact if they are without support in the record. Id.

## 2. Law and Application

### a. Designated Groundwater Basins and De-Designation

¶18 Subsurface water (i.e., groundwater) is generally presumed to be tributary to surface water and is thus managed within the prior appropriation system pursuant to the 1969 Act. Colo. Ground Water Comm'n v. N. Kiowa-Bijou Groundwater Mgmt. Dist., 77 P.3d 62, 69–70 (Colo. 2003). However, the groundwater in a designated groundwater basin is presumed to be designated groundwater—water that, as a matter of law, "has no more than a de minimis impact on any surface stream." Gallegos I, 147 P.3d at 28–29. Designated groundwater is managed by the Commission within a modified prior appropriation system pursuant to the Management Act. Chatfield E. Well Co. v. Chatfield E. Prop. Owners Ass'n, 956 P.2d 1260, 1268 (Colo. 1998).

¶19 The Commission designates a groundwater basin pursuant to its statutory authority under the designation statute, section 37-90-106(1)(a). The groundwater in the putative basin must meet one of two standards to be designated: It must be (1) "groundwater which in its natural course would not be available to and required for the fulfillment of decreed surface rights," or (2) "groundwater in areas not adjacent to a continuously flowing natural stream wherein groundwater withdrawals have constituted the principal water usage for at least fifteen years." § 37-90-103(6)(a). The General Assembly created this designation mechanism for the express purpose of "permit[ting] the full economic development of designated groundwater resources." § 37-90-102(1), C.R.S. (2016); Upper Black Squirrel Creek Ground Water Mgmt. Dist. v.

<u>Goss</u>, 993 P.2d 1177, 1183–84 (Colo. 2000). The designation criteria are meant to achieve this goal in a manner that also protects surface water rights from injury.

¶20 Apart from designation authority, the General Assembly also gave the Commission authority to de-designate, or "alter the boundaries or description" of, an already-designated basin to ensure that surface rights are not injured. § 37-90-106(1)(a). Under the version of the statute in effect at all times pertinent to these proceedings, the Commission could only alter a designated groundwater basin's boundaries where "future conditions require and factual data justify" de-designating a portion of the basin. <u>Id.</u>[6] To justify de-designation, the petitioner must prove that pumping of subsurface water within a designated groundwater basin has "more than a de minimis impact on their surface water rights and is causing injury to those rights." <u>Gallegos I</u>, 147 P.3d at 31 (clarifying <u>State ex rel. Danielson v. Vickroy</u>, 627 P.2d 752 (Colo. 1981), and <u>Pioneer Irrigation Dists. v. Danielson</u>, 658 P.2d 842 (Colo. 1983)).

¶21 Because de-designation revisits a prior adjudication, claim and issue preclusion may apply to limit the evidence that the party seeking de-designation may rely on. <u>Id.</u> at 32–33. When a preclusion doctrine applies, a party's showings of impact, measured by connectivity and injury, must be made with evidence that was not "before the Commission when the Basin was originally designated." <u>Id.</u> at 33.

---

[6] As we detailed above, the amended statute also provides that the amendment shall not affect litigation pending as of January 1, 2010, meaning it does not affect this litigation. § 37-90-106(1)(a.5).

¶22 Here, Gallegos seeks partial de-designation of a basin and must show that future conditions and factual data justify altering the Basin boundaries pursuant to section 37-90-106(1)(a). But as we held in Gallegos I, Gallegos is precluded from relitigating any matter that was actually litigated or could have been litigated before the original 1987 Commission. Id. at 32. Consequently, Gallegos's claim "must fail if [Gallegos is] unable to present evidence on connectivity and injury other than that which was before the Commission when the Basin was originally designated." Id. at 33. In sum, then, Gallegos must: (1) show by new evidence not before the 1987 Commission (2) that the Well Owners' pumping has a greater than de minimis impact on its senior surface rights (3) such that future conditions and factual data justify de-designating a portion of the Basin.

¶23 To show that the pumping has a greater than de minimis impact, Gallegos must prove both connectivity and injury. We conclude that Gallegos failed to prove connectivity in accordance with these standards. Therefore, we need not reach the injury prong to affirm the designated groundwater court's order denying de-designation.

### b. Connectivity

¶24 The parties do not dispute that groundwater in the Basin is connected to the surface water that would feed the Larson rights. Rather, the dispute is over whether Gallegos proved by new evidence not before the 1987 Commission that future conditions and factual data justify de-designating a portion of the Basin because the Basin waters are connected to the waters that feed Gallegos's surface water rights. To

17

resolve this dispute, we begin by clarifying the meaning of the future conditions and factual data requirements under section 37-90-106(1)(a) and defining connectivity. We then assess whether Gallegos introduced new evidence not before the 1987 Commission of connectivity such that future conditions and factual data justify de-designating a portion of the Basin.

¶25    When interpreting a statute, this court's primary task is to give effect to the legislature's intent. Open Door Ministries v. Lipschuetz, 2016 CO 37M, ¶ 18, 373 P.3d 575, 579. "To do so, we look to the plain meaning of the statutory language and consider it within the context of the statute as a whole." Lewis v. Taylor, 2016 CO 48, ¶ 20, 375 P.3d 1205, 1209. Where the language is clear, we must apply the language as written. Goodman v. Heritage Builders, Inc., 2017 CO 13, ¶ 7, 390 P.3d 398, 401. Only where statutory language is susceptible to more than one reasonable interpretation is it ambiguous, and only then can we resort to extrinsic aids to determine and effectuate the legislature's intent. See Carson v. Reiner, 2016 CO 38, ¶ 13, 370 P.3d 1137, 1140.

¶26    The General Assembly did not define any part of the phrase "as future conditions require and factual data justify" in the designation statute or elsewhere in article 90, nor have we had occasion to construe it.

¶27    Applying the above principles of statutory construction here, we conclude that section 37-90-106(1)(a) is unambiguous. First, the phrase "factual data" in this context can only mean an evidence-based determination. Second, the term "conditions" refers to the status of the basin and the waters that it encapsulates, including water levels, the flow rate of any surface waters, and water use practices within the basin. See

18

§ 37-90-106(1)(b)(I)–(V) (outlining the findings required to designate a basin). Finally, the term "future" is only reasonably read as modifying "conditions" to mean that only conditions discovered or arising after the basin is designated can provide a sufficient basis to justify modifying a designated groundwater basin boundary. We conclude on this basis that section 37-90-106(1)(a) plainly requires evidence of conditions newly discovered or occurring after the original basin designation date to justify the modification of a basin boundary.

¶28 The connectivity requirement, on the other hand, requires definition. The General Assembly did not define "connectivity" in the designation statute, but commentators have suggested that groundwater is hydrologically connected to surface water if it will influence the rate at which the surface water flows. Robert V. Trout et al., Acquiring, Using, and Protecting Water in Colorado 24, 60 (rev. ed. 2011); see 2 Waters and Water Rights § 18.01–.03 (Amy K. Kelley, ed., 3d ed. LexisNexis/Matthew Bender 2017) (discussing hydrogeology and the need for conjunctive management of ground and surface waters due to their interrelatedness, i.e., connectivity). We also have recognized that connectivity turns on the influence that groundwater has on surface water. See N. Kiowa-Bijou, 77 P.3d at 70 ("Because tributary ground water is connected to surface waters, use of this ground water may reduce available surface water . . . ."). Indeed, hydrologic connectivity is the defining feature of tributary groundwater, the type of groundwater managed under the 1969 Act within the constitutional prior appropriation system that governs surface waters. Water Rights of Park Cty. Sportsmen's Ranch LLP v. Bargas, 986 P.2d 262, 265 (Colo. 1999) ("In

Colorado, ground water that is hydrologically connected to a surface stream is generally considered 'tributary' and is subject to the constitutional doctrine of prior appropriation."); see also § 37-90-103(10.5) (defining non-tributary groundwater based on the rate at which the groundwater will affect surface waters). We conclude against this backdrop that connectivity means a linkage between groundwater and surface water such that augmenting or depleting groundwater impacts the availability or flow of surface water.

¶29 Having clarified the meaning of "future conditions," "factual data," and "connectivity," we now assess whether Gallegos satisfied these requirements.

¶30 Gallegos points to several pieces of evidence that it introduced to show connectivity. First, Gallegos asserts that there is no actual dispute that the waters are connected, but the 1987 Commission received no evidence on connectivity because the Commission designated the Basin pursuant to a designation standard that did not implicate or require any investigation into connectivity. According to this argument, any evidence that Gallegos produced in the present dispute would necessarily constitute new evidence not before the 1987 Commission. Second, Gallegos alleges that Crow Creek is a gaining stream where the alluvial aquifer necks down at the Larson headgate, thus indicating that the groundwater in the alluvium is connected to the surface flows of Crow Creek. In making this second argument, Gallegos heavily relies on the Plate 2 hydrologic map from the Kirkham Report. Gallegos's primary expert asserted at trial that there is very little permeability between the alluvial aquifer and the aquifer underlying it, so saturating the alluvial aquifer means that surface water will

20

discharge at the gaining sections of Crow Creek (as indicated by upward-sweeping potentiometric curves on the Plate 2 map).[7]  Another Gallegos expert testified that he observed water running in Crow Creek at the Larson headgate on dates when no water was flowing in the creek at the Wyoming state line.  Gallegos asserts that this testimony similarly indicates that water wells up from the aquifer to become surface water in Crow Creek, or in other words, that the groundwater in the Basin is connected to Crow Creek.  This evidence fails under both section 37-90-106(1)(a) and Gallegos I.

¶31     Gallegos's showings are inadequate under the designation statute because they do not consist of evidence of conditions newly discovered or occurring after the original basin designation date sufficient to justify the modification of a basin boundary.  The Gallegos experts' interpretations of Plate 2 and the data that they gathered for the proceedings below do suggest that, however we would measure it, the groundwater in the Basin is connected to Crow Creek.  But as the designated groundwater court concluded, this testimony and evidence "merely confirmed what the [1987] Commission already knew at the time of the designation hearing—that the aquifer is hydraulically connected to Crow Creek."  At best, Gallegos has merely shown that the groundwater and Crow Creek were connected when the Basin was designated and are still connected today.  This does not constitute a showing of either a condition arising since 1987 or a condition newly discovered since 1987, and does not, therefore, satisfy the statutory requirements for de-designation.

---

[7] The hearing officer and designated groundwater court found that at least some of the Well Owners are pumping from the alluvial aquifer.

¶32 Gallegos's showings similarly fail under our holding in Gallegos I. As we reiterated in Gallegos I, claim preclusion bars relitigation of matters that "could have been litigated in a prior proceeding." 147 P.3d at 32. Just as we conclude that Gallegos has, at best, shown a continuing connectivity that existed at the time of designation, we also conclude that the connectivity claim could have been litigated in the designation proceedings. The designated groundwater court noted that Gallegos "relie[d] extensively" on Plate 2 and the testimony of Kirkham and the other state experts who conducted the viability study to make its connectivity showing. This evidence would also have been the primary evidence for litigating connectivity at designation, and thus, was plainly before the 1987 Commission because the 1987 Commission relied on Plate 2 and its preparers' testimony in designating the Basin.

¶33 The 1987 Commission also relied on this evidence and related testimony to modify the originally proposed Basin boundaries. When the 1987 Commission conducted its hearing to decide whether to designate the Basin, only one family in the area, the Lambertsons, objected to the proposed designation boundaries. The Lambertsons argued that designation would harm their surface rights on nearby Little Crow Creek. The primary author of the Kirkham Report testified before the 1987 Commission that he "believe[d]" the aquifer was hydrologically connected to surface waters in the area generally, but that Little Crow Creek was outside the Crow Creek study area and no hard data could confirm the connection between groundwater and the surface waters in Little Crow Creek. Despite the lack of data specifically pertaining to Little Crow Creek, the 1987 hearing officer found that the aquifer water was

22

connected to the Lambertsons' surface water and modified the proposed Basin boundaries to exclude the Lambertsons' farm.

¶34 Even if this testimony and the supporting evidence in the Kirkham Report merely went to carving the Lambertsons' property out of the Basin's proposed boundaries, it was nevertheless available to the 1987 Commission. Pursuant to the designated groundwater court's unchallenged pretrial order, evidence that was "available" to the 1987 Commission was in fact "before" the 1987 Commission. We therefore decline to disturb the designated groundwater court's finding that Gallegos relies on a reformatted presentation of old evidence that was before the 1987 Commission. Consequently, we conclude that Gallegos's showings do not meet the standard that we set forth in Gallegos I.

### 3. Conclusion on De-Designation

¶35 We conclude that Gallegos failed to prove by evidence not before the 1987 Commission that the Well Owners are pumping water connected to Crow Creek such that factual data and future conditions justify de-designating a portion of the Basin. Accordingly, we affirm the designated groundwater court's order denying Gallegos's petition.

### B. Costs Award—Case No. 15SA277

¶36 Having resolved the merits in favor of the Well Owners, we now turn to the propriety of the designated groundwater court's order awarding them a portion of their litigation costs. Gallegos raises five issues on appeal in this regard. We reject four of these arguments; because the fifth is unpreserved, we decline to address it. We

ultimately conclude that the designated groundwater court did not abuse its discretion in concluding that the Well Owners were prevailing parties for purposes of Rule 54(d), that the costs awarded were reasonable and necessary, and that Gallegos should pay these costs pursuant to Rule 54(d).

## 1. Standard of Review and Issue Preservation

¶37 We review a trial court's award of costs for an abuse of discretion and will only disturb the award if it is manifestly arbitrary, unreasonable, or unfair. Archer v. Farmer Bros. Co., 90 P.3d 228, 230 (Colo. 2004). We review de novo the trial court's interpretation of a rule of civil procedure. Garcia v. Schneider Energy Servs., Inc., 2012 CO 62, ¶ 7, 287 P.3d 112, 114.

¶38 The Well Owners argue that Gallegos failed to preserve all but one of the five issues it appeals regarding the cost award. Gallegos counters that it either preserved the issues or that the issues arose post-award and that preservation is irrelevant. Our review of the record suggests that Gallegos previously argued—and thus preserved— four of the issues that it raises here. See, e.g., White v. F. A. Heckendorf, Inc., 433 P.2d 112, 113 (Colo. 1967) (conditioning the availability of an issue for review on its argument in the court below).

¶39 Our review of the record further reveals, however, that Gallegos failed to raise a timely objection to the designated groundwater court's decision to award costs to a non-party. This fifth issue is not of the sort to arise only after the court below issued its order—Gallegos knew that the Well Owners claimed these expenses when it filed its response to the Well Owners' motion for costs, and it could have objected in its

24

response. Because this issue is unpreserved, we decline to address it. <u>Robinson v. State Lottery Div.</u>, 179 P.3d 998, 1008 (Colo. 2008) ("We have often said that issues not raised in or decided by a lower court will not be addressed for the first time on appeal."); <u>Union Gold Mining Co. v. Rocky Mountain Nat. Bank</u>, 2 Colo. 248, 257 (1873) (opinion of Hallett, C.J.) ("It does not appear that any objection . . . was made by appellant, and, therefore, it is in no position to question its regularity here.").

## 2. Prevailing Parties Eligible for Costs Pursuant to C.R.C.P. 54(d)

¶40 First, Gallegos argues that the Well Owners are not eligible to receive the costs of their litigation because Gallegos did not bring claims directly against the Well Owners that would have required them to incur costs. Rather, Gallegos argues that it named the Commission as defendant, that the Commission bore the responsibility of defending the current Basin boundaries, and that only the Commission necessarily incurred litigation costs. In contrast, Gallegos asserts, the Well Owners participated voluntarily rather than relying on the Commission to defend their interests, and consequently, that any litigation costs they incurred were not necessary and cannot be awarded under C.R.C.P. 54(d). Gallegos argues in the alternative that even if the Well Owners' participation was generally necessary, their expert witnesses were redundant to the Commission's experts, meaning those expert witness fees may not be awarded as necessary to the litigation.

¶41 Rule 54(d) provides in relevant part that "[e]xcept when express provision therefor is made . . . reasonable costs shall be allowed as of course to the prevailing party considering any relevant factors which may include the needs and complexity of

25

the case and the amount in controversy." A party prevails for purposes of Rule 54(d) when it "prevails on a significant issue in the litigation and derives some of the benefits sought." Archer, 90 P.3d at 230. Rule 54(d) expressly requires that the cost be "reasonable," and we have also required that the cost be "necessary for the development of the case," Cherry Creek Sch. Dist. No. 5 v. Voelker ex rel. Voelker, 859 P.2d 805, 813 (Colo. 1993) (discussing discovery depositions); accord First Citizens Bank & Tr. Co. v. Stewart Title Guar. Co., 2014 COA 1, ¶ 54, 320 P.3d 406, 415–16 (extending Cherry Creek to transcript preparation).

¶42    In sum, Rule 54(d) permits the award of reasonable and necessary costs of litigation to the prevailing party unless another statute or rule prohibits or provides for cost-shifting. The designated groundwater court only awarded costs associated with the trial de novo; it did not award costs for the preceding administrative hearings. The trial de novo before the designated groundwater court—presided over by a district court judge sitting by designation as the designated groundwater court judge—qualifies as litigation. See Fort Morgan Reservoir & Irrigation Co. v. Groundwater Appropriators of S. Platte River Basin, Inc., 85 P.3d 536, 541 (Colo. 2004) ("By the time a water case gets to a de novo hearing before a water judge, it carries many of the indicia of contested civil litigation. The issues have been crystallized, and the parties have likely identified witnesses, perhaps expert witnesses, and exhibits that they intend to introduce at trial."). Gallegos has not identified another statute or rule that otherwise governs cost-shifting in this context, and we have found none. Thus, awarding costs under Rule

54(d) was permissible as long as the Well Owners were prevailing parties and their expert witness costs were reasonable and necessary.

¶43     We agree with the court below that the Well Owners were prevailing parties for purposes of Rule 54(d). The Well Owners, whose water rights and farming income were at stake, were "necessary" parties to the litigation. Indeed, the designated groundwater court issued an order joining the Well Owners as indispensable parties under C.R.C.P. 19(a) precisely because of their stake in this litigation. To be sure, the Well Owners could have chosen not to participate. They could have relied on the Commission to defend the Basin boundaries and, for all practical purposes, their ability to pump water for irrigation. But had the Commission failed, the Well Owners' place in the Basin would be gone, their junior water rights would be curtailed, and their farms would have faced the same failure that precipitated this lawsuit. Worse still for the Well Owners, claim and issue preclusion would likely impede, if not outright bar, any subsequent attack on the de-designation judgement. Having participated in the litigation to oppose Gallegos's efforts, however, the Well Owners obtained the results they wanted: The Basin boundaries remain the same, their wells are still in the Basin, and the State Engineer cannot curtail their pumping. Given the Well Owners' interests in the litigation and the results they obtained, the designated groundwater court did not abuse its discretion in concluding that the Well Owners were prevailing parties under Rule 54(d). See Cotton Creek Circles, LLC v. Rio Grande Water Conservation Dist., 218 P.3d 1098, 1102–03 (Colo. 2009) (affirming an award of costs to the State Engineer and proponents of a rulemaking in a proceeding to challenge the rulemaking).

¶44     We also conclude that the Well Owners' experts were reasonable and necessary to this litigation for purposes of Rule 54(d).  The designated groundwater court explained in its order that the Well Owners' primary expert, whose fees constitute the bulk of the cost award, was pivotal in persuading the designated groundwater court that Gallegos's experts employed deficient methodology and that their testimony was therefore flawed.  The court found the Well Owners' expert to be "more persuasive" than Gallegos's experts and credited the former's testimony that the latter's analysis was "too simplistic and did not account for a number of critical factors."

¶45     Because we conclude that the Well Owners are prevailing parties in this litigation for purposes of Rule 54(d), and because we conclude that their expert fees were reasonable and necessary to develop this litigation, we conclude that the designated groundwater court did not abuse its discretion in awarding costs to the Well Owners.

### 3.  Excessive Award of Expert Fees

¶46     Second, Gallegos argues that the designated groundwater court found only 96 hours of the Well Owners' expert's bill to be reasonable, but that the court awarded costs for all 228 hours the expert billed for the litigation.  The Well Owners counter that Gallegos has misread or misconstrued the costs order, and that the $37,000 expert fee award reflects an implicit finding that all 228 hours billed were reasonable.  The Well Owners also point out that they submitted multiple affidavits in the record substantiating the 228 hours charged, and that the court's order awarding the full amount is thus supported in the record.

28

¶47 The starting point for determining the amount of a reasonable expert witness fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Am. Water Dev., Inc. v. City of Alamosa, 874 P.2d 352, 386 (Colo. 1994). The issue here is whether the designated groundwater court accurately performed this calculation.

¶48 Gallegos's argument references a single finding in the costs order in which the court recounted that the Well Owners' primary expert "performed an additional ninety-six hours of work that was billed to the Defendants at the rate of $165.00 per hour." There is no indication in this sentence or the surrounding text of the order that this assessment is exclusive of other findings that the full 228 hours were reasonable. Indeed, the order states without qualification that the Well Owners' experts were "integral" to the litigation, that their testimony was "quite persuasive," and that the fees charged were "reasonable." Following this assessment and a brief discussion approving one expert's mileage claim, the designated groundwater court ordered that Gallegos pay $37,000 in expert witness fees. This amount roughly corresponds to the $165 hourly rate multiplied by 228 hours, the number of hours that the Well Owners submitted for their expert's time.[8]

¶49 Because the record supports that the designated groundwater court calculated the cost award for the expert fees by multiplying the number of hours that the expert

_____

[8] This calculation would actually yield a total of $37,620, but the designated groundwater court explained that the expert did not charge the Well Owners for a portion of the hours that he worked.

worked by the expert's reasonable rate, we conclude that the designated groundwater court did not abuse its discretion in awarding $37,000 in expert witness fees.

### 4. Costs Associated with Attending a Deposition

¶50 Third, Gallegos argues that the designated groundwater court abused its discretion in awarding costs associated with the Well Owners' primary expert attending the deposition of Gallegos's primary expert. Gallegos asserts that, although such costs are now permissible in complex contemporary litigation, this water case is not complex. It also asserts that the expert's attendance did not further the litigation and was thus unnecessary because (1) the Well Owners did not explain why they needed an expert, and (2) Gallegos had already made the pretrial expert witness testimony disclosures that informed the Well Owners of the anticipated substance of his testimony. Finally, Gallegos argues that it is unfair to make it pay both for its own expert's fees (as the deponent) and the Well Owners' expert's fees.

¶51 The thrust of Gallegos's argument is that it was unnecessary for the Well Owners' expert to attend the deposition and that it is therefore unfair to charge Gallegos for the cost. The designated groundwater court disagreed, finding that Gallegos relied heavily on its expert's testimony at trial, that deposing Gallegos's expert before trial was "essential to the development of the case," and that the Well Owners' expert was "integral" to challenging Gallegos's expert. The court also found that the expert's fees were reasonable.

¶52 As we explained above, taxing costs associated with expert witnesses under Rule 54(d) is proper where those costs are reasonable and necessary for the development of the case. See Cherry Creek, 859 P.2d at 813.

¶53 We conclude that the designated groundwater court did not abuse its discretion in awarding the Well Owners' costs associated with having their expert witness attend the deposition. Expert witnesses are important fixtures in most water rights litigation. Because of the lack of quantitative data here, the experts' investigations, reports, and interpretive testimony effectively constituted the entirety of each side's case. Given the technical nature of these experts' subject matter, methodology, and testimony, it is only natural that the Well Owners would rely on an expert to explain and counter Gallegos's expert. We thus affirm the designated groundwater court's decision to award the Well Owners' costs associated with having their expert prepare for and attend the deposition of Gallegos's expert.

### 5. Expert Fees Associated with Responding to Discovery Requests

¶54 Gallegos argues that, under C.R.C.P. 26(b)(4)(C), the designated groundwater court should have imposed the costs of deposing Gallegos's expert on the Well Owners, not on Gallegos. Gallegos asserts that the text of Rule 26 provides for the award of such fees, and therefore that they cannot be taxed under Rule 54(d). The Well Owners counter that this argument misapprehends the plain language of Rule 26(b)(4)(C), which only provides for the initial cost allocation, not a final cost allocation that would render such costs untaxable under Rule 54(d).

¶55 As we recited above, Rule 54(d) allows trial courts to tax costs "[e]xcept when express provision therefor is made either in a statute of this state or in these rules." Rule 26(b)(4)(C) provides that "[u]nless manifest injustice would result . . . the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under this subsection . . . ."

¶56 The plain language of Rule 26 appears to make an "express provision" for which one party must bear the costs of deposing an expert in preparation for trial, meaning those expenses would not be eligible to be awarded under Rule 54(d). But we have explained that Rule 54(d)'s prohibition against awarding costs only applies where "there is a statute or rule specifically prohibiting the award of costs . . . ." Rossmiller v. Romero, 625 P.2d 1029, 1030 (Colo. 1981) (emphasis added). Rule 26(b)(4)(C) does not "specifically prohibit[] the award of costs," so a party who pays these costs and then prevails in the litigation is entitled to have those costs taxed to the non-prevailing party. See id.

¶57 We conclude on this basis that the designated groundwater court did not abuse its discretion in taxing these costs to Gallegos.

## 6. Conclusion on Costs

¶58 We have addressed the substantive arguments that Gallegos advances in support of its appeal of the order awarding costs to the Well Owners. To the extent that we have not expressly addressed its other arguments, we note that we have considered these arguments and found them to be unpersuasive.

¶59    We conclude that the designated groundwater court did not abuse its discretion in concluding that the Well Owners were prevailing parties for purposes of Rule 54(d), that the costs awarded were reasonable and necessary, and that Gallegos should pay these costs pursuant to Rule 54(d).

## III.  Conclusion

¶60    We conclude that Gallegos failed to prove by evidence not before the 1987 Commission that the Well Owners are pumping water connected to Crow Creek such that factual data and future conditions justify de-designating a portion of the Basin.  As such, we affirm the designated groundwater court's order denying Gallegos's petition. We also conclude that the designated groundwater court did not abuse its discretion in concluding that the Well Owners were prevailing parties for purposes of Rule 54(d), that the costs awarded were reasonable and necessary, and that Gallegos should pay these costs pursuant to Rule 54(d).