24CA1624 Robinson v Sharma 11-20-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1624
Pueblo County District Court No. 21CV30017
Honorable Gregory J. Styduhar, Judge

Mickel Robinson,

Plaintiff-Appellant,

v.

Steve Sharma and Pueblo-Tomic-Sharma Family Limited Partnership n/k/a P-T-S Family Limited Partnership, a limited partnership,

Defendants-Appellees.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Sullivan and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 20, 2025

Montgomery Little & Soran, P.C., Nathan G. Osborn, Alyson S. Evett, James Taravella, Greenwood Village, Colorado, for Plaintiff-Appellant

Gordon Rees Scully Mansukhani LLP, John R. Mann, Tamara A. Seelman, Denver, Colorado, for Defendants-Appellees

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Plaintiff, Mickel Robinson (Ms. Robinson), appeals the trial court's judgment in favor of defendants, Steve Sharma (Mr. Sharma)[1] and Pueblo-Tomic-Sharma Family Limited Partnership a/k/a P-T-S Family Limited Partnership, a limited partnership (the Partnership). We affirm.

## I.    Background

¶ 2     The Partnership is a family business. Mahendra Sharma (father) and Sylvia Sharma (mother) (collectively, the parents) established the Partnership pursuant to a partnership agreement executed on January 11, 1993 (Original Partnership Agreement). The purpose of the Partnership was the acquisition of an apartment complex in Pueblo, Colorado, which was the Partnership's sole asset. The Original Partnership Agreement established the general partners as the parents and the limited partners as their six children, including Ms. Robinson and Mr. Sharma.

---

[1] Because this is an intra-family dispute, there are multiple participants with the last name Sharma. For clarity, we will refer to defendant Steve Sharma as "Mr. Sharma" and to other members of the family with the last name Sharma either by their full name or, in the case of Mahendra Sharma and Sylvia Sharma, as father and mother, respectively. We mean no disrespect in doing so.

¶ 3    This case involves disputes between and among the partners and Partnership concerning the management and winding up of the Partnership, including the distribution of the Partnership assets, following the sale of the Partnership's sole asset in April 2017.

¶ 4    Several provisions of the Original Partnership Agreement are central to this dispute.  Section 6.3 of the Original Partnership Agreement outlines the original capital contributions and the ownership percentages of each family member:

> The [g]eneral [p]artners shall jointly contribute $52.00 to the capital of the Partnership.  Each of the [l]imited [p]artners, or the [g]eneral [p]artners acting on their behalf, shall contribute $8.00 to the capital of the Partnership.  In exchange for such capital contributions, the [g]eneral [p]artners, as husband and wife, shall jointly receive 52 units of interest in the Partnership, and the [l]imited [p]artners shall each receive eight (8) units of interest in the Partnership.

¶ 5    Section 12.7 of the Original Partnership Agreement, which is titled "Initiation of Legal Action," outlines the consequences should any limited partner initiate legal action against the Partnership or any of its general partners.  Section 12.7 provides as follows:

> If any one or more of the [l]imited [p]artners shall initiate any legal action of any kind against the Partnership, either of the [g]eneral

2

> [p]artners, or any combination thereof, the [g]eneral [p]artners shall have a right to acquire all units of interest in the Partnership held by any such [l]imited [p]artners, for the consideration specified in subparagraph (v) of Section 12.2 of this Agreement, at any time within four years from and after the commencement of any such action.

¶ 6    Section 12.2(v), in turn, sets forth the formula for a general partner's acquisition of a limited partner's interest, should the general partner invoke the buyout provision described in section 12.7:

> Such [l]imited [p]artners shall give to the [g]eneral [p]artners a first right of refusal to acquire all such units, for the amount of the capital contribution originally made to the Partnership on behalf of such [l]imited [p]artner, as specified in Section 6.3 of this Agreement, plus interest thereon at the rate of ten percent (10%) per annum from and after January 1, 1993; exercisable at any time within sixty (60) days of provision of all necessary documents to the [g]eneral [p]artners, exercisable jointly on a pro-rata basis or separately by either as to all such Units.

¶ 7    Read together, the above sections of the Original Partnership Agreement provide that the general partners shared a 52% interest in the Partnership while each of the limited partners owned an 8% interest in the Partnership.  Further, sections 12.7 and 12.2(v)

provide that if any of the limited partners were to bring a suit against a general partner or the Partnership, the general partner has a right to buy out that limited partner's interests in the Partnership for the amount of that limited partner's original capital contribution, plus interest.  With these provisions in mind, we turn to the events leading up to this litigation.

¶ 8    In 2011, Ms. Robinson became property manager of the Partnership's sole asset — the apartment complex in Pueblo.  Ms. Robinson's duties included maintaining the books and financial records and communicating with the Partnership's accountant about the Partnership's tax returns.

¶ 9    During the early 2010s, the Partnership experienced financial difficulties, and in May 2014, the Partnership filed for bankruptcy protection in the United States Bankruptcy Court for the District of Colorado.  In August 2015, Ms. Robinson submitted a "Third Amended Plan of Reorganization" (the Plan) to the bankruptcy court.  The Plan authorized an investor, RAK Ventures Colorado, LLC, to purchase 50% of the apartment complex, pay the Partnership's outstanding debts, and refurbish and sell the apartment complex.  The bankruptcy court approved the Plan.

¶ 10    On April 6, 2017, Ms. Robinson and her mother entered into an agreement that authorized Ms. Robinson to handle all aspects of the apartment complex's sale, made Mr. Sharma the general partner upon the close of the sale, and instructed Ms. Robinson to release all sale profits to Mr. Sharma, as the general partner.  On April 10, 2017, the apartment complex was sold for $3,617,630.46.

¶ 11    Following the sale, Ms. Robinson requested that Mr. Sharma, as general partner, distribute the sale proceeds according to an ownership scheme in which she owned a 13% interest in the Partnership.  It was her position that the Partnership automatically dissolved upon the sale of the Partnership's sole asset.  It was also Ms. Robinson's contention that sometime between the formation of the Partnership in 1993 and the sale of the apartment complex in 2017, an "Amended Partnership Agreement" had been adopted,

pursuant to which her interest in the Partnership had increased from 8% to 13%.[2]

¶ 12   On April 17, 2018, Ms. Robinson received an early distribution of a portion of her anticipated share of the sale proceeds in the amount of $232,157.  The ostensive purpose of this early distribution was to pay the tax liability Ms. Robinson anticipated incurring on her purported 13% interest in the Partnership (which, based on the sales price, she expected to total approximately $470,000).

¶ 13   Years after the dissolution, Mr. Sharma had still not wound up or terminated the Partnership, nor had he distributed the proceeds of the sale — other than Ms. Robinson's early distribution.  Between 2018 and 2020, Ms. Robinson made several requests that

---

[2] During the course of discovery, Ms. Robinson produced the purported Amended Partnership Agreement, which was dated an unspecified day of March 2017.  The purported Amended Partnership Agreement is nearly identical to the Original Partnership Agreement except that it removes father as a general partner, waives Stephanie Sharma's interests in the Partnership, updates the Partners' names and addresses, reduces mother's interests by 5%, and increases Ms. Robinson's interests by 5%.  At trial, Mr. Sharma testified that he didn't sign and had never seen the Amended Partnership Agreement until sometime after the initiation of this lawsuit.

Mr. Sharma, as the general partner, wind up the Partnership and distribute the proceeds of the sale of the apartment complex. As of the end of 2020, however, the proceeds from the sale of the apartment complex still hadn't been distributed to the Partners.

¶ 14 Having grown frustrated with the delay, on January 21, 2021, Ms. Robinson filed suit against the Partnership, Mr. Sharma, and her other siblings, asserting eight claims for relief. Ms. Robinson asserted the following six claims for relief against Mr. Sharma: (1) request for an accounting; (2) breach of the partnership agreement; (3) conversion; (4) breach of fiduciary duty; (5) embezzlement; and (6) civil theft. Ms. Robinson's remaining two claims were asserted against all of the defendants and were for (7) dissolution by decree of court; and (8) winding up by decree of court and appointment of a trustee. In her complaint, Ms. Robinson asserted that she was entitled to an award of $470,291.96 in damages, based on her asserted 13% interest in the Partnership.

¶ 15 On July 26, 2023, less than five weeks before trial was set to begin, Mr. Sharma asserted a counterclaim for declaratory judgment pursuant to sections 6.3, 12.2, and 12.7 of the Original Partnership Agreement, alleging that by filing this lawsuit,

Ms. Robinson triggered the buyout provision of the Original Partnership Agreement, pursuant to which he, as the general partner, had a right to buy out her interests in the Partnership for $8 — her capital contribution to the Partnership — plus interest at the rate of 10% per annum from January 1, 1993, until paid.

¶ 16    The case proceeded to a bench trial over the course of three days in August and October of 2023.  In June 2024, the trial court entered thorough and detailed written findings of fact, conclusions of law, and judgment (Order).  In its Order, the trial court found in favor of the defendants on all of Ms. Robinson's claims and for Mr. Sharma on his counterclaim.

¶ 17    With respect to the first claim for relief for an accounting, the trial court found that Ms. Robinson's request for an accounting had been satisfied over the course of the litigation, as during discovery and at trial the Partnership and Mr. Sharma provided Ms. Robinson the full accounting to which she was entitled.  With respect to Ms. Robinson's request for orders to wind up and dissolve the Partnership, the trial court found that Mr. Sharma now had all the information necessary to wind up and dissolve the Partnership and

8

that he was ready and willing to do so, so orders for dissolution, winding up, and appointment of a trustee were "unnecessary."

¶ 18    With respect to Ms. Robinson's second claim for relief for breach of the partnership agreement, the court found that the purported Amended Partnership Agreement was unenforceable because there was "no evidence [Mr.] Sharma agreed to this alleged amendment or that the required process for amending the [Original] Partnership Agreement occurred." The court further found that neither Mr. Sharma nor the Partnership breached the Original Partnership Agreement.

¶ 19    The trial court also rejected Ms. Robinson's claims for conversion, embezzlement, and civil theft, finding that there was no evidence presented that Mr. Sharma had exercised dominion or ownership over any property belonging to Ms. Robinson. The trial court found that the remaining proceeds from the sale of the apartment complex remained in a bank account belonging to the Partnership and that Ms. Robinson failed to show that Mr. Sharma intended to maintain those funds for himself.

¶ 20    Addressing Ms. Robinson's claims that Mr. Sharma had breached his fiduciary duty, the trial court found that Mr. Sharma's

delay in distribution was proper to determine the ownership structure of, and debts owed by, the Partnership. Additionally, the trial court found that Ms. Robinson had agreed to use the Partnership funds to pay their parents' living expenses and any payment of mother's expenses did not affect Ms. Robinson's distribution. Lastly, the trial court found that the Original Partnership Agreement allowed Mr. Sharma to use the Partnership funds to pay legal expenses.

¶ 21 The trial court concluded that the ownership percentages of the Partnership were as follows:

| | |
|---|---|
| Ms. Robinson | 8% |
| Mr. Sharma | 8% |
| Shaun Sharma | 8% |
| Shelly Sharma | 8% |
| Sandy Sharma | 8% |
| Sylvia Sharma | 60% |

¶ 22 With respect to Mr. Sharma's counterclaim, the trial court found that to give meaning to the entire contract, the buyout provision of the Original Partnership Agreement was enforceable even while the Partnership was in a state of dissolution. With that,

the trial court found that since Ms. Robinson had initiated the present lawsuit, then Mr. Sharma, as the general partner, *had the right* to purchase Ms. Robinson's interests for $8 plus interest at 10% per annum from January 1, 1993, forward. In its Order, the trial court didn't disturb the April 17, 2018, distribution to Ms. Robinson.

## II.    Analysis

¶ 23    Ms. Robinson raises five issues on appeal. Specifically, she contends that the trial court erred by (1) selectively enforcing provisions of the Amended Partnership Agreement while finding that the Amended Partnership Agreement was invalid and unenforceable; (2) admitting and relying upon irrelevant and prejudicial evidence regarding her conduct during the course of the Partnership's bankruptcy; (3) finding that Mr. Sharma didn't breach the fiduciary duties he owed to the Partnership; (4) finding the buyout provision of the Original Partnership Agreement enforceable; and (5) awarding the defendants the full amount of their costs. For the reasons set forth below, we reject all five contentions and, therefore, affirm.

### A. The Trial Court Didn't Enforce Any Provisions of the Amended Partnership Agreement

¶ 24    Ms. Robinson contends that the trial court erred by improperly ruling that the Amended Partnership Agreement was invalid while also enforcing portions of it.  Specifically, she argues that the trial court erred by refusing to enforce the provision of the Amended Partnership Agreement stating she had a 13% interest in the Partnership while enforcing the provisions that removed father and Stephanie Sharma from the Partnership.  We disagree that the court erred.

### 1. Standard of Review

¶ 25    While contract interpretation is a question of law, whether a contract exists or has been modified or amended is a question of fact.  *I.M.A., Inc. v. Rocky Mountain Airways, Inc.* 713 P.2d 882, 887 (Colo. 1986).  "We set aside a trial court's factual findings only when they are 'so clearly erroneous as to find no support in the record.'" *S. Ute Indian Tribe v. King Consol. Ditch Co.*, 250 P.3d 1226, 1232 (Colo. 2011) (citations omitted).

## 2.	Application

¶ 26	Ms. Robinson's argument presents us with two distinct questions: (1) Did the trial court incorrectly conclude that the Amended Partnership Agreement was unenforceable, and (2) did the trial court enforce provisions of the Amended Partnership Agreement notwithstanding its finding that it wasn't validly adopted?  We conclude the answer to both of those questions is no.

### a.	The Trial Court Properly Concluded that the Amended Partnership Agreement was Unenforceable

¶ 27	To begin, the trial court's finding that the Amended Partnership Agreement was invalid and unenforceable is supported by the record.  In assessing the validity of the Amended Partnership Agreement, the court first looked at the terms of the Original Partnership Agreement.  As the trial court noted, section 17.5 of the Original Partnership Agreement governs the amendment process of the Original Partnership Agreement.  Section 17.5 provides:

> Amendments to this Agreement may be proposed by the [g]eneral [p]artners or by [p]artners owning a majority of the [u]nits. Following any such proposal, the [g]eneral [p]artners shall submit to the [l]imited [p]artners a verbatim statement of any proposed amendment, providing that counsel for the Partnership shall have approved of the

> same in writing as to form, and the [g]eneral [p]artners may include in any such submission their recommendation as to the proposed amendment. The [g]eneral [p]artners shall seek the written vote of the [p]artners on the proposed amendment or shall call a meeting to vote thereon. . . . A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the affirmative vote of the Partners owning a majority of the [u]nits.

¶ 28 At trial, Ms. Robinson admitted that she didn't follow this process in creating or executing the Amended Partnership Agreement. Furthermore, Mr. Sharma testified that he never signed the Amended Partnership Agreement, never voted on it, and never saw it until the initiation of this lawsuit. This evidence amply supports the trial court's finding that the Amended Partnership Agreement was invalid and unenforceable, so there is no basis for us to disturb the trial court's finding in this regard. Based on Ms. Robinson's and Mr. Sharma's testimony that the amendment process wasn't followed for the purported Amended Partnership Agreement, we conclude that the trial court's finding that the Amended Partnership Agreement was invalid and unenforceable isn't a clear error.

14

### b. Ms. Robinson is Mistaken that the Trial Court Relied on the Amended Partnership Agreement to Remove Parties from the Partnership

¶ 29    Ms. Robinson next argues that the court's findings that father and Stephanie Sharma had been removed as general partner and limited partner, respectively, can only stem from enforcement of the Amended Partnership Agreement, which is inconsistent with its findings discussed immediately above. The trial court, however, didn't base its findings regarding the removal of father and Stephanie Sharma from the Partnership on the terms of the Amended Partnership Agreement.

¶ 30    To begin, the fact that father was no longer a member of the Partnership was an undisputed fact agreed upon by the parties ahead of trial, as memorialized in the parties' joint proposed trial management order. Furthermore, the trial court found that Stephanie Sharma had been removed from the Partnership based on the testimony of other limited partners, not the terms of the Amended Partnership Agreement. Indeed, limited partners Ms. Robinson, Mr. Sharma, Shelly Sharma, and Shaun Sharma all testified that their sister Stephanie Sharma had voluntarily relinquished her interests. Accordingly, we reject Ms. Robinson's

contention that the trial court improperly and inconsistently enforced select terms of the Amended Partnership Agreement. Instead, the trial court properly relied on undisputed facts and testimony, *not* the Amended Partnership Agreement, in reaching its findings that father and Stephanie Sharma had been removed from the Partnership.

> **B.    The Trial Court Didn't Err by Admitting Evidence of Ms. Robinson's Self-Dealing and Other Misconduct**

¶ 31     Ms. Robinson next contends that the trial court erred by admitting irrelevant and prejudicial evidence about the Plan and her conduct following its adoption.  Ms. Robinson continues that the evidence of her self-dealing and financial mismanagement is not only irrelevant but amounts to improper character evidence. Further, she asserts that by admitting evidence about her failure to comply with the Plan, the trial court effectively adjudicated claims never asserted by Mr. Sharma.  We discern no error.

> **1.    Additional Facts**

¶ 32     The Plan, approved by the bankruptcy court on September 24, 2015, outlined the terms of the Partnership restructuring and placed compensation limits on Ms. Robinson and her husband for

work they performed pursuant to the Plan. The Plan provided that Ms. Robinson would remain the manager of the apartment complex and that her husband would oversee maintenance.

¶ 33 According to evidence presented at trial, on October 2, 2015, eight days after the bankruptcy court approved the Plan, Ms. Robinson entered into a "Tenancy in Common Agreement" with a third-party entity. This third-party entity was owned by the same owner of RAK Ventures, LLC, the investor that purchased the apartment complex. The Tenancy in Common Agreement established *both* Ms. Robinson and her husband as the managers of the apartment complex and authorized payments to them in excess of the compensation limits set forth in the Plan.

¶ 34 Thereafter, Ms. Robinson routed all revenue from the apartment complex into a bank account owned by Skyview2025, LLC (Skyview2025). Ms. Robinson and her husband were the owners of Skyview2025. Ms. Robinson didn't inform Mr. Sharma, the limited partners, or the bankruptcy court of the Tenancy in Common Agreement or the existence or role of Skyview2025.

¶ 35 The defendants retained an expert, Johnathan T. Marks, to "rebut claims raised by [Ms. Robinson] concerning the alleged

financial mismanagement and theft of proceeds from the sale of real property." In his report, Marks opined that there was no evidence that Mr. Sharma mismanaged the proceeds from the sale of the apartment complex. Marks further opined that any delay in providing an accounting or winding up the Partnership by Mr. Sharma was caused by Ms. Robinson's failure to provide Mr. Sharma with the Partnership's financial records, not any mismanagement or misconduct on his part

¶ 36    Marks also opined that Ms. Robinson "acted inappropriately, including engaging in self-dealing." He based this opinion, in substantial part, on the Tenancy in Common Agreement and Ms. Robinson's utilization of Skyview2025 to collect rent and revenue. Further, Marks highlighted Ms. Robinson's failure to notify the Partnership of the Tenancy in Common Agreement or Skyview2025.

¶ 37    Prior to trial, Ms. Robinson filed a motion in limine seeking to strike Marks' report and prohibit him from testifying at trial. In the motion in limine, Ms. Robinson argued that Marks' report and testimony were "unreliable, irrelevant to the issues in this case, [and] unfairly prejudicial," citing CRE 401, 403, 703, 611, and 801.

18

The trial court denied the motion in limine in a written order entered in advance of trial.

## 2.    Standard of Review

¶ 38    "Trial courts have broad discretion in determining the admissibility of evidence based on its relevance, its probative value, and its prejudicial impact." *People v. Elmarr*, 2015 CO 53, ¶ 20. We will only reverse a trial court's evidentiary ruling upon an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002). "We will find an abuse of discretion only where the lower court's decision was manifestly arbitrary, unreasonable, or unfair." *People v. Hoskins*, 2014 CO 70, ¶ 17.

## 3.    Preservation

¶ 39    While we don't require parties to use "talismanic language" to preserve issues on appeal, trial courts must be afforded an "adequate opportunity to make findings of fact and conclusions of law on any issue before we will review it." *People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004). "To properly preserve an issue for appeal, a party's objection or request must be specific enough to (1) draw the court's attention to the asserted error; (2) provide the court with a meaningful opportunity to focus on the issue; and

(3) prevent or correct the error." *People v. Anderson*, 2020 COA 56, ¶ 11 (citations omitted). Generally, arguments raised for the first time in a post-trial motion aren't considered properly preserved for appeal, unless there wasn't an opportunity to raise them to the trial court before or during trial. *Fid. Nat'l Title Co. v. First Am. Title Ins. Co.*, 2013 COA 80, ¶ 51; *In re Marriage of Herold*, 2021 COA 16, ¶ 7.

¶ 40 In her opening brief, Ms. Robinson asserts that the evidence of her conduct during the pendency of the Partnership's bankruptcy was "nothing more than an attempted character assassination of Ms. Robinson without complying with C.R.E. 404(b)." For preservation of this argument, Ms. Robinson points us to her motion in limine and the trial court's order on it. But Ms. Robinson didn't raise any CRE 404(b) argument in her motion in limine. Nor does such an argument appear in any other pre-trial motion, nor did counsel preserve it in an objection at trial or at any other time when Ms. Robinson had the opportunity to raise it.

¶ 41 The first time we can discern that Ms. Robinson raised a CRE 404(b) concern was in her reply in support of her motion to amend judgment pursuant to C.R.C.P. 59(a)(3)-(4). Because Ms. Robinson had so many opportunities to raise this argument

20

before and during trial, this post-trial filing is insufficient for preservation purposes. As such, we conclude that the CRE 404(b) argument wasn't properly preserved for appeal.[3] *See Fid. Nat'l Title Co.,* ¶ 51; *Herold,* ¶ 7.

### 4. Analysis

#### a. Evidence of Ms. Robinson's Self-Dealing and Financial Mismanagement is Relevant

¶ 42    We first address Ms. Robinson's contention that the evidence of her self-dealing and financial mismanagement was irrelevant to any claims that were before the trial court.

¶ 43    All relevant evidence is admissible unless barred by statutes, rules of evidence, the Constitution, or other rules prescribed by the Colorado Supreme Court. CRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of

---

[3] Even if the issue was properly preserved, there is nothing in the record to indicate that the court relied on the evidence of self-dealing and financial mismanagement as propensity evidence. As discussed below, the trial court admitted the evidence as support for Mr. Sharma's defense, not to prove that Ms. Robinson acted in compliance with the bad character inferred by the evidence on a separate occasion. CRE 404(b). Therefore, if the trial court's failure to address the Rule 404(b) character evidence argument was an error, we conclude it was a harmless error that didn't affect the outcome or fairness of the trial. *See* C.R.C.P. 61.

consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. The Colorado Rules of Evidence strongly favor the admission of relevant evidence. *People v. Czemerynski*, 786 P.2d 1100, 1108 (Colo. 1990), *abrogated on other grounds by*, *Rojas v. People*, 2022 CO 8.

¶ 44 The crux of several of Ms. Robinson's claims against Mr. Sharma is that he unduly delayed the winding up of the Partnership. Part of Mr. Sharma's defense to this allegation is that the delay was attributable, at least in part, to Ms. Robinson's conduct during the pendency of the Partnership's bankruptcy.

¶ 45 This defense is supported by assertions made in Marks' expert report that the delay in proceeds distribution was "due in large part to Ms. Robinson's failure to provide [Mr. Sharma] with the books and records of the Partnership until August 2022 when they were produced in discovery as part of this lawsuit." Further, Marks found that "Ms. Robinson's record keeping was, at best sloppy and, at worst, deceptive." Finally, Marks stated that understanding the funds routed through Skyview2025 was integral to the proceeds distribution process.

¶ 46 In its order on Ms. Robinson's motion in limine, the trial court found that the expert testimony and portions of the expert report were "directly relevant to the heart of this case when considering Defendants['] stated reasons why [the Partnership] and [Mr. Sharma], as [the Partnership]'s [g]eneral [p]artner have not issued distributions to partners." Ultimately, the trial court relied on Marks' expert opinion to support its finding that Mr. Sharma didn't breach his fiduciary duty.

¶ 47 Thus, the evidence of Ms. Robinson's conduct during the pendency of the Partnership's bankruptcy and Marks' report were relevant to Mr. Sharma's defense and the claims before the trial court.

    b.    The Trial Court Didn't Adjudicate Ms. Robinson's Conduct Pertaining to the Bankruptcy Plan

¶ 48 Relatedly, Ms. Robinson contends that the trial court improperly relied on Marks' report and testimony to adjudicate that she violated the terms of the Plan — an issue, Ms. Robinson argues, that wasn't before the court, that was time barred, and that the trial court lacked jurisdiction to consider. The trial court did no such thing.

¶ 49   In its order, the trial court only mentions the Plan or Ms. Robinson's conduct during the course of the bankruptcy in the context of resolving Ms. Robinson's claims against Mr. Sharma, in which she claims his dilatory conduct was to blame for the delay in winding up the Partnership and delaying the distribution of proceeds from the sale. There was nothing improper in the court's considering whether the evidence established that Ms. Robinson's misconduct was the cause of the delays she complained of. In its order finding that Mr. Sharma didn't breach the Original Partnership Agreement and didn't breach his fiduciary duties, the trial court details the delay by stating that Ms. Robinson withheld financial documents, concealed the Tenancy in Common Agreement that was "contrary to the [bankruptcy] [p]lan," and concealed that revenue from the Partnership was being redirected to an account owned by her and her husband. These are the only mentions of Ms. Robinson's conduct or the Plan in the trial court's "adjudication" of claims.

¶ 50   Simply put, the trial court didn't make a finding that the Plan had been breached, didn't enter any orders regarding the Plan, and didn't modify or enforce the Plan. Instead, the trial court only

24

found that Ms. Robinson's conduct was contrary to the Plan — and did so in the context of resolving Ms. Robinson's claims against Mr. Sharma on their merits. There was nothing improper in how the court conducted its analysis or the evidence it relied upon to reach its conclusions.

## C. The Trial Court Didn't Err by Finding That Mr. Sharma Didn't Breach His Fiduciary Duty

¶ 51 Ms. Robinson next contends that the trial court erred by finding that Mr. Sharma didn't breach his fiduciary duty. We aren't persuaded.

### 1. Legal Principles

¶ 52 "[W]hether a fiduciary duty has been breached is a factual question we review for clear error." *Mintz v. Accident & Injury Med. Specialists, PC*, 284 P.3d 62, 68 (Colo. App. 2010), *aff'd*, 2010 CO 50. "A court's factual finding is clearly erroneous if there is no support for it in the record." *In re Marriage of Young*, 2021 COA 96, ¶ 8; *see also Owners Ins. Co. v. Dakota Station II Condo. Ass'n*, 2021 COA 114, ¶ 50 (appellate courts won't disturb a trial court's findings of fact "if there is any evidence in the record to support them").

## 2.    Analysis

¶ 53    Ms. Robinson's theory at trial was that Mr. Sharma breached his fiduciary duty by waiting to distribute the Partnership interests, failing to determine and pay the Partnership's debts, not obtaining the Partnership's financial records, and paying for their parents' living expenses using the Partnership funds.[4]  The trial court rejected each of these contentions based on its weighing of the evidence presented at trial.  Instead of arguing that the trial court didn't have any record support for its findings on these claims, Ms. Robinson simply points out that there was conflicting evidence that could have supported a contrary finding.  But our role on appeal isn't to reweigh the evidence.  *See Owners Ins. Co.*, ¶ 50 ("It's

---

[4] In addition to the arguments explored below, Ms. Robinson also argues on appeal that Mr. Sharma breached his fiduciary duties by failing to complete the Partnership's taxes and by insisting that Ms. Robinson's interest in the Partnership was only 5% prior to this lawsuit.  Ms. Robinson cites the trial court's judgment as where these issues are preserved, but she doesn't direct us to where she made these arguments to the trial court.  Moreover, in its findings, the trial court doesn't address whether Mr. Sharma breached his fiduciary duties for these reasons.  Thus, these arguments aren't preserved for appeal.  *See, e.g., Franklin D. Azar & Assocs. P.C. v. Ngo*, 2024 COA 99, ¶ 51 ("Generally, to preserve an issue for appeal, the issue must be brought to the trial court's attention and the court must be given the opportunity to rule on it.").

the trial court's sole province to resolve factual issues, determine witness credibility, weigh evidence, and make reasonable inferences from that evidence. We may not reweigh evidence or substitute our own judgment for the trial court's." (citing *In re Estate of Owens,* 2017 COA 53, ¶ 22)). Moreover, as discussed below, there is ample support in the record for the trial court's findings that Mr. Sharma didn't breach his fiduciary duties.

### a. Support for the Trial Court's Finding that Mr. Sharma's Delay in Interest Distribution Wasn't a Breach of Fiduciary Duty

¶ 54 First, the court found that Mr. Sharma didn't breach his fiduciary duties by waiting to distribute Partnership interests. The court reasoned that the Original Partnership Agreement *required* Mr. Sharma to first "determine the debts and ownership structure of [the Partnership]" *before* he could make a final distribution. This is supported by section 14.2 of the Original Partnership Agreement, which sets forth the process for winding up the Partnership. Additionally, Mr. Sharma testified that he needed to sort out the Partnership debts before distribution.

¶ 55 The trial court further found it was Ms. Robinson who caused the delay in winding up the Partnership by impairing Mr. Sharma's

ability to calculate the Partnership's liabilities. Both Mr. Sharma and Marks testified that Mr. Sharma was unable to calculate the Partnership's liabilities without access to the Partnership's financial documents, which were in the possession of Ms. Robinson. Marks also testified that Mr. Sharma acted prudently in waiting to figure out the debts and ownership structure before making the final distribution to the partners.

¶ 56    Based on this evidence, the trial court's findings that Mr. Sharma didn't breach his fiduciary duty by waiting to distribute the proceeds, failing to obtain financial documents, and waiting to calculate the Partnership's liabilities were amply supported by the record.

   b.    Support for the Trial Court's Finding that Mr. Sharma's Payment of the Parents' Living Expenses Wasn't a Breach of Fiduciary Duty

¶ 57    Second, the trial court found that Mr. Sharma didn't breach his fiduciary duty by using the Partnership funds to pay for the living expenses of their parents. The trial court relied on a mediation agreement in which Ms. Robinson and Mr. Sharma agreed to such an allocation. What's more, the trial court pointed out that the mediation agreement requires any funds used for the

28

parents' living expenses to be taken out of their mother's future distribution. We conclude that this finding had sufficient support in the record.

¶ 58    As previously stated, Ms. Robinson's appellate contentions don't highlight a lack of support for the trial court's findings or judgments. Instead, she asks us to review the evidence de novo and relitigate the issue. That isn't the standard for these findings. Because the trial court had sufficient support for its judgment that Mr. Sharma didn't breach his fiduciary duties, we conclude that it wasn't a clear error.

D.    The Trial Court's Determination that the Buyout Provision is Enforceable Isn't a Basis for Reversal

¶ 59    Ms. Robinson next argues that the trial court improperly enforced section 12.7 of the Original Partnership Agreement — what we are referring to as the buyout provision. She argues that (1) because the Partnership was in a state of dissolution at the time she filed suit, the buyout provision couldn't be invoked; and (2) the terms of the buyout provision are unconscionable and are, therefore, void as a matter of public policy. But because Ms. Robinson hasn't demonstrated how she was prejudiced by the

29

court's enforcement of the provision, we don't reach the merits of

Ms. Robinson's challenge. [5]

### 1. Legal Principles

¶ 60 Rule 61 of the Colorado Rules of Civil Procedure states, "The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights

---

[5] If we were to reach the merits of Ms. Robinson's challenges to the buyout provision, we would only address the first contention, not the second. That is because Ms. Robinson didn't preserve her second contention for our review. "In civil cases, arguments never presented to, considered by, or ruled upon by a district court may not be raised for the first time on appeal." *Gebert v. Sears, Roebuck & Co.*, 2023 COA 107, ¶ 25. Although no talismanic language is required to preserve an issue for appellate review, *see In re Estate of Owens*, 2017 COA 53, ¶ 21, still "[t]o properly preserve an argument for appeal, the party asserting the argument must present 'the sum and substance of the argument' to the district court." *Gebert*, ¶ 25 (quoting *Madalena v. Zurich Am. Ins. Co.*, 2023 COA 32, ¶ 50). A review of the record reveals that Ms. Robinson never argued to the trial court that the terms of the buyout provision were unconscionable and, therefore, void as a matter of public policy. And a handful of questions regarding the "fairness" of the buyout provision isn't adequate to preserve the argument that Ms. Robinson advances on appeal. *See, e.g., Liberty Bankers Life Ins. Co. v. First Citizens Bank & Tr. Co.*, 2014 COA 151, ¶ 27 (finding a contention unpreserved where "each cited-to instance of preservation was vague and conclusory, there was no clear argument in support, and there were no citations to authority"); *Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010) (finding an argument made in closing arguments preserved for appeal).

of the parties." "An error affects a substantial right only if 'it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'" *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010) (quoting *Banek v. Thomas*, 733 P.2d 1171, 1178 (Colo. 1986)).

### 2.    Analysis

¶ 61    Based on the trial court's findings and our disposition of the other issues raised on appeal, we can't discern how Ms. Robinson's substantial rights or interests were adversely affected by the court's determination that Mr. Sharma, as the general partner, had the right to enforce the buyout provision.  We reach this conclusion based on the combined effect of five critical factual determinations by the trial court and our resolution of Ms. Robinson's challenges to those determinations.  Specifically, the court made the following findings, which, as discussed above, we have declined to disturb on appeal:

- In April 2018, Ms. Robinson received an early distribution from the Partnership of a share of sales proceeds in the amount of $232,157.

- Any final distribution that Ms. Robinson may be entitled to receive under the Original Partnership Agreement would be offset by the early distribution she received in April 2018.

- Ms. Robinson's interest in the Partnership in the absence of the enforcement of the buyout provision is 8% (not the 13% Ms. Robinson argued for).

- Although the Partnership received $3,617,630.46 in proceeds from the sale of the apartment complex, based on the Marks report, the total amount subject to distribution to the partners as of August 2023 was only $2,264,795.26 (after deducting Partnership liabilities from the sale proceeds).

- The trial court didn't order Ms. Robinson to return any portion of the $232,157 she received from the Partnership in April 2018.

¶ 62 Based on these findings (the first two of which aren't in dispute and the latter three of which we aren't disturbing on appeal), Ms. Robinson would have been entitled to 8% of $2,264,795.26, less the $232,157 she received as an early

distribution. Eight percent of $2,264,795.26, is $181,183.62, which is *less* than the $232,157 she's already received (and that the court didn't order returned). Thus, had the court *not* enforced the buyout provision, Ms. Robinson wouldn't have been entitled to any additional distribution from the Partnership.[6] Thus, she can't establish any prejudice from the court's enforcement of the provision.

¶ 63     The trial court determined that Mr. Sharma had the right to enforce the buyout provision of the Original Partnership Agreement and purchase Ms. Robinson's interests in the Partnership for $8 plus interest because she initiated this lawsuit. Based on our disposition of the other issues on appeal, however, Ms. Robinson's early distribution, and the requirements under the trial court's judgment, we fail to discern any prejudice to Ms. Robinson resulting

---

[6] We recognize that based on the theory that Ms. Robinson advanced in her complaint and at trial, she would have been entitled to an additional distribution had the court not found the buyout provision enforceable. This is because she contended that she was entitled to a final distribution based on a 13% ownership interest and that the total amount of proceeds subject to distribution, in her view, was $3,617,630.46. Based on this view of the facts, she would have been entitled to a distribution of $470,291.96, less her early distribution of $232,157, for a net additional distribution of $238,134.96.

from enforcement of the buyout provision.[7]  Thus, we decline to address the merits of Ms. Robinson's arguments.  *See* C.R.C.P. 61.

E.     The Trial Court Didn't Abuse Its Discretion When Awarding Expert Witness Costs

¶ 64     Finally, Ms. Robinson contends that the trial court abused its discretion when awarding costs to the defendants, specifically, the expert witness fees because those fees were unreasonable.  We disagree that the trial court erred.

1.     Standard of Review and Legal Principles

¶ 65     "[W]e review an award of costs for an abuse of discretion and will only disturb the award if it is manifestly arbitrary, unreasonable, or unfair."  *Archer v. Farmer Bros. Co.*, 90 P.3d 228, 230 (Colo. 2004).  We will find an abuse of discretion only where the trial court's findings "are so manifestly against the weight of evidence as to compel a contrary result."  *In re Weisbard*, 25 P.3d 24, 28 (Colo. 2001) (quoting *Aspen Wilderness Workshop, Inc. v.*

---

[7] In fact, it would appear that Ms. Robinson would realize a modest benefit if Mr. Sharma exercises the general partner's rights under the buyout provision, as doing so would appear to entitle Ms. Robinson to receive $8, plus thirty-two years of interest at 10% per annum, compared to the $0 Ms. Robinson would receive if Mr. Sharma didn't enforce the buyout provision.

*Hines Highlands Ltd. P'ship*, 929 P.2d 718, 728 (Colo. 1996)). "It is not necessary that we agree with the trial court's decision," the decision just can't "exceed[] the bounds of the rationally available choices." *Streu v. City of Colorado Springs*, 239 P.3d 1264, 1268 (Colo. 2010) (citation omitted).

¶ 66 Trial courts have considerable discretion in awarding costs to a prevailing defendant if (1) those costs are reasonably and necessarily incurred in defending litigation and (2) there is no statute or rule that prohibits such an award. *Valentine v. Mountain States Mut. Cas. Co.*, 252 P.3d 1182, 1186-87 (Colo. App. 2011). Courts may consider any relevant factors, including "the needs and complexity of the case." C.R.C.P. 54(d). "The starting point for determining the amount of a reasonable expert witness fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Gallegos Fam. Props., LLC v. Colo. Groundwater Comm'n*, 2017 CO 73, ¶ 47.

### 2. Analysis

¶ 67 In its June 24, 2024, order awarding defendants their costs, the trial court awarded the defendants the full amount of requested costs, totaling $219,719.72. Most of these costs ($209,264.20) were

for fees paid to defendants' expert witness, Marks, and other team members of the accounting firm, Baker Tilly. This is the portion of the award Ms. Robinson challenges on appeal. Although Ms. Robinson takes issue with the amount of time the professionals spent on the case, she doesn't challenge the reasonableness of their hourly rates. Accordingly, we won't address whether the court erred in determining that the hourly rates were reasonable.

¶ 68 Ms. Robinson makes several arguments as to why the amount of time billed by the defendants' experts was unreasonable and unnecessary:

- The lawsuit wasn't complicated and thus didn't require the extensive work billed.

- The experts' time was spent looking into conduct outside the scope of the litigation.

- Mr. Sharma made no attempt to control costs.

- The expert report utilized more resources than necessary.

- The travel costs of the testifying expert witness, Marks, and his associate were facially unnecessary.

¶ 69 We will take these arguments in turn.

¶ 70    First, Ms. Robinson argues that the costs were unreasonable because the lawsuit wasn't complicated.  In assessing the complexity of the case, the trial court made the following findings:

> Contrary to the Plaintiff's assertion, this matter was complicated.  Plaintiff asserted eight claims for relief alleging financial misconduct by Defendants [the Partnership] and Mr. Sharma, and Mr. Sharma asserted a counter-claim seeking to enforce a provision in [the Original] Partnership Agreement.  This required review of a large amount of complex financial documents over a lengthy period of time to analyze the financial obligations of [the Partnership] and the flow of [the Partnership]'s money.

¶ 71    As the trial court observed, litigating the eight claims generated substantial discovery.  The documents the experts worked through were complex and spanned decades.  We discern no abuse of discretion in the trial court's determination that this was a complicated matter.

¶ 72    Second, Ms. Robinson argues that the expert fees were unreasonable because of the time the experts spent looking into her alleged self-dealing and financial mismanagement.  Ms. Robinson again argues that this evidence wasn't relevant to the claims before the court and, thus, the time the experts spent on these issues was

unreasonable. As we have already addressed, evidence of Ms. Robinson's self-dealing and financial mismanagement was offered by Mr. Sharma as a defense to the breach of fiduciary duty claims. With this being a key component of Mr. Sharma's defense, and the trial court's reliance on the expert in resolving these claims, we aren't persuaded that this makes the expert witness fees unreasonable.

¶ 73    Third, Ms. Robinson contends that the fees are unreasonable because Mr. Sharma made no attempt to control the expert costs. As the trial court noted, "[T]he vast majority of the review was performed by Mr. Marks' team members who charged lower hourly rates." This is supported by Baker Tilly's itemized invoice, which shows that most of Marks' billable hours were spent drafting the report, while his team with lower hourly rates completed most of the document review. Accordingly, we aren't persuaded that the trial court abused its discretion in rejecting Ms. Robinson's contention that the defendants failed to control expert costs.

¶ 74    Fourth, Ms. Robinson argues that the report utilized more resources than necessary. Specifically, Ms. Robinson cites the number of Baker Tilly team members working on preparing the

report. This argument appears to conflict with the argument immediately before it. Ms. Robinson complains that Mr. Sharma wasn't controlling costs but then complains about the cost-controlling measures that were taken — namely, relying on personnel with lower billing rates to perform certain tasks. We again agree that the cost controlling measures of using Baker Tilly team members with a lower hourly rate was reasonable; thus, we aren't persuaded that the use of multiple people in the review was unreasonable.

¶ 75 Fifth, Ms. Robinson argues that Marks' and his associate Manny Muriel's travel to Pueblo for the trial was unreasonable. Specifically, Ms. Robinson asserts that (1) Marks' travel was unnecessary because virtual testimony would have sufficed; (2) Marks attended trial on days he didn't testify; and (3) Muriel's travel was unnecessary because he didn't contribute at all.

¶ 76 The trial court found that "[t]here is nothing per se unreasonable about a key expert witness traveling to testify in person." The trial court further opined that "the suggestion that appearance should have been presumptively remote, flies in the face of the C.R.C.P. and Chief Justice Directive."

¶ 77    As the trial court alluded to, virtual testimony is the exception, not the rule, under the Colorado Rules of Civil Procedure. C.R.C.P. 43(i)(1) requires a party to request virtual testimony via a written motion, providing the reason for allowing virtual testimony, a detailed description of the testimony, and copies of all documents that will be used in the virtual testimony. C.R.C.P. 43(i)(1). It is within the trial court's discretion to approve or deny the request. *Id.* As such, we agree with the trial court that it wasn't unreasonable for Marks to testify in person.

¶ 78    Lastly, we will address Ms. Robinson's last two travel arguments together. Ms. Robinson argues that Marks' travel costs were unreasonable because he attended two days of trial (August 30, 2023, and August 31, 2023) where he didn't testify. Additionally, Ms. Robinson argues that Muriel's travel was unnecessary because he didn't contribute to testimony.

¶ 79    Colorado courts have historically allowed fees for expert witnesses who didn't testify if the expenses were incurred because of the litigation and were reasonably necessary for trial preparation. *See Mgmt. Specialists, Inc. v. Northfield Ins. Co.*, 117 P.3d 32, 39 (Colo. App. 2004); *Fowler Irrevocable Tr. 1992-1 v. City of Boulder*,

992 P.2d 1188, 1200 (Colo. App. 1999), *aff'd in part and rev'd in part on other grounds*, 17 P.3d 797 (Colo. 2001).

¶ 80      As an initial matter, the trial court acknowledged that Marks was expected to testify on August 31, 2023. Addressing both Marks' and Muriel's trial attendance on August 30, 2023, and August 31, 2023, the trial court found that "[i]t is . . . not unreasonable in a complex case like this for a party, the party's expert and the expert witness' main associate working on the matter to also travel to and attend the trial." Further, the trial court noted that Muriel had significant involvement in this litigation.

¶ 81      A review of the Baker Tilly invoices confirms both Marks' and Muriel's hands-on involvement in the matters before the trial court. Both Marks and Muriel spent their time preparing the expert witness report; researching, reviewing, and analyzing the relevant Partnership financial documents; and helping with trial preparation, both ahead of trial and during trial. Because major points of contention in this lawsuit were the debts of the Partnership, the ownership percentages, and the financial state of the Partnership in general, these expert expenses were incurred by

41

reason of the litigation.  Further, both Marks and Muriel brought their professional knowledge of the expert report to aid the defense team in person at trial.

¶ 82    We don't discern an abuse of discretion in the trial court determination that it was reasonable for the expert witnesses to travel to trial, even if they didn't both testify.

¶ 83    Because the case and its discovery was in fact complicated, Baker Tilly properly employed multiple lower-cost team member to analyze the complicated discovery and look into defenses for Mr. Sharma.  Further, because the expert witness and his main associate who helped prepare the expert report traveled to Pueblo to assist in trial preparation, we can't conclude that the trial court abused its discretion in awarding the full award of costs.

### III.    Disposition

¶ 84    For these reasons, the judgment is affirmed.

JUDGE SULLIVAN and JUDGE BERNARD concur.